IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
IN SEATTLE

| | |
|---|---|
| RECEIVERSHIP ESTATE OF SOLSTICE GROUP, INC. AND SOLSTICE HOLDINGS, INC. C/O TURNING POINTE, LLC, RECEIVER<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. 2:24-cv-01522<br><br>**JURY DEMAND**<br><br>**COMPLAINT** |

## COMPLAINT

COMES NOW Solstice Group, Inc. (hereinafter "Plaintiff" or "Solstice") by and through its undersigned counsel and files this Complaint against Defendant, United States of America ("Defendant" or "United States"), and alleges as follows:

**Complaint**  1  **Robert V. Boeshaar**
**Attorney at Law, LL.M., PLLC**
2125 Western Avenue, Suite 330
Seattle, WA 98121
Telephone: (206) 623-0063

## NATURE OF ACTION

1. Plaintiff files this civil action for a refund of amounts paid to the Internal Revenue Service under 26 U.S.C. section 7422.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. sections 1340 and 1346, and venue is proper under 28 U.S.C. section 1402.

## THE PARTIES

3. Plaintiff is the receiver of Solstice Group, Inc. and Solstice Holdings, Inc., a corporation which was incorporated in the State of Washington with a principal place of business of 640 S Spokane St, Seattle, WA 98134.  On January 3, 2024 it was administratively dissolved.

4. Defendant is the United States of America and may be served by mailing two copies of this Complaint by certified mail to Tessa M. Gorman, United States Attorney for the Western District of Washington, 700 Stewart Street, Suite 5220, Seattle, Washington, 98101-1271 and mailing two copies of the Complaint by certified mail to the Honorable Merrick Garland, Attorney General of the United States, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

## THE NATURE OF THE TAX ISSUE

5. Employers are required by law to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes from their employees' wages and pay those withholdings to the IRS.  Additionally, employers are required to pay their own portion of the FICA taxes and Federal Unemployment Taxes and Federal Unemployment Tax Act ("FUTA") taxes (collectively referred to as "employment taxes").  26 U.S.C §§ 3102, 3111, 3301, and 3402.

Employers are required by law to periodically deposit these employment taxes in an appropriate federal deposit bank in accordance with federal regulations. 26 U.S.C. §§ 6302, 6157; 26 C.F.R. §§ 31.6302-1, 31.6302(c)-1, 31.6302(c)-3. Employers are also generally required to file Employer's Quarterly Federal Tax Returns ("IRS Form 941") and annual FUTA Tax Returns ("IRS Form 940") (collectively referred to as "employment tax returns") reporting such taxes to the IRS. 26 U.S.C. § 6011; 26 C.F.R. § 31.6071(a)-1.

## The Employee Retention Tax Credit

6. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted to encourage businesses to keep employees on their payroll by providing them an Employee Retention Credit[1] ("ERC"). It also was enacted to make sure workers were not forced to choose between their paychecks and the public health measures needed to combat the Coronavirus. The ERC is a refundable tax credit for certain eligible businesses and tax-exempt organizations with employees and whose business operations were affected during the COVID-19 pandemic.

7. To qualify for the Employee Retention Credit, an employer must experience either:

    a. A full or partial suspension of operations due to government order due to COVID-19 during any taxable quarter; or

    b. A significant decline in gross receipts.

If either condition is met, the employer may be eligible for the ERC which is calculated as

---

[1] *See* The Coronavirus Aid, Relief and Economic Security Act (CARES Act), Pub. L. No 116-136, 134 Stat. 281 (2020), as amended by section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), enacted as Division EE of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2020).

**Complaint**      3      **Robert V. Boeshaar**
**Attorney at Law, LL.M., PLLC**
2125 Western Avenue, Suite 330
Seattle, WA 98121
Telephone: (206) 623-0063

a percentage of the amount of qualified wages paid in a calendar quarter.

## ERC Qualification Requirements Met by Solstice

<u>1.  Full or Partial Suspension of Operations Due to COVID-19 Related Government Order</u>

8. Section 2301(c)(2)(A)(ii)(I) of The Coronavirus Aid, Relief and Economic Security Act (CARES Act) provides that an employer will be eligible for the Employee Retention Credit if their operations were partially or fully suspended during a calendar quarter because of an order from an appropriate governmental authority that limited commerce, travel, or group meetings for commercial, social, religious, or other purposes because of COVID-19.

9. Solstice was impacted by Executive Order Number 20-25, Stay Home – Stay Healthy, enacted by Washington Governor Jay Inslee on March 23, 2020.  This order closed certain businesses and directed people to limit their movements and personal interactions outside of their homes to only those necessary to obtain or provide essential services or conduct essential activities.  It also required businesses to implement social distancing and sanitation measures.

10. Solstice was founded in 2011 and was headquartered in Seattle, Washington.  The company produced and processed cannabis and cannabis-related products and sold its cannabis products primarily through retail stores. Solstice's activities included propagation, cultivation, harvest, dry, cure, and packaging.  The company's products included flower in different unit sizes (cannabis as most people are familiar), pre-roll joints, hydrocarbon extraction, and vape.

11. Executive Order 20-25 affected Solstice's ability to conduct sustainable business. Its facility and garden were located in Seattle and were subject to both the Washington State and King County requirements which mandated social distancing, face coverings, and other measures. These restrictions on in-person space and capacity forced it to have fewer employees in its garden

and significantly decreased production. Solstice cut its flower offerings in half (from four products to two products) and then only made pre-rolls and concentrates. These State and County orders also prevented the company from holding in person meetings to supervise, train, review, and/or engage with teams.

12. On March 20, 2020, Solstice had adopted a COVID-19 prevention plan with procedures to be followed by the company depending on the severity of the COVID-19 outbreak. Executive Order 20-25 forced Solstice to implement Stage 3 of its COVID-19 Plan. It ceased all in-person meetings and stopped all face-to-face employee interactions, placed visual 6-foot markers throughout the facility, limited the number of people in its garden, ceased all store visits for the sales team, ceased all visits to the facility for the retail and sales teams, and stopped all facility tours. It also limited its customer facing approach with sales and marketing.

13. Masking guidelines made it more difficult for Solstice to attend to the growth of its products in their indoor garden where temperatures averaged about 80 degrees Fahrenheit. It began to build orders only on a limited basis and deliver only pre-built products.

14. These government orders related to COVID-19 caused Solstice to experience a full or partial suspension of its operations during Q2 through Q4 of 2020 and continuing through the end of Q3 of 2021.

2. Qualified Wages

15. For purposes of determining qualified wages, IRS Notice 2021-23 states that whether payments made to employees are considered qualified wages depends, in part, on the average number of full-time employees an eligible employer employed during 2019. All wages paid qualify for the credit for employers that averaged one hundred or fewer full-time

employees ("FTEs") in 2019. A full-time employee for the ERC is defined as an employee who averages at least 30 hours of service per week or 130 hours per calendar month. For employers that averaged more than 100 FTEs in 2019, only wages paid to employees who were not providing services qualify for the credit. For 2021, the credit amount is 70 percent of qualified wages paid, and the limit increases to $10,000 in wages per employee per quarter. All wages paid qualify for the credit for employers that averaged five hundred or fewer FTEs in 2019.

16. Further, qualified wages must include payments that are considered "wages" within the meaning of Section 3121(a) of the Internal Revenue Code – which generally means all renumeration for employment. Accordingly, for eligible employers described in Section 2301(f)(2) of the CARES Act, as amended, renumeration for services described in paragraphs 5, 6, 7, 10, and 13 of Section 3121(b) of the Code constitute wages for purposes of determining the ERC for the second, third and fourth calendar quarters of 2020 and the first, second and third quarters of 2021.

17. Solstice had an average number of full-time employees in 2019 of 61.

18. The following chart shows the amount of qualified wages Solstice paid in the second, third and fourth calendar quarters of 2020 and the first, second and third quarters of 2021, and the Employee Retention Credit

| Period | Qualified Wages | ERC |
|---|---|---|
| Q2 2020 | $341,098.51 | $170,549.26 |
| Q3 2020 | $132,824.33 | $66,412.17 |
| Q4 2020 | $161,917.71 | $80,958.86 |
| Q1 2021 | $495,650.25 | $346,955.18 |

**Complaint** 6

Robert V. Boeshaar
Attorney at Law, LL.M., PLLC
2125 Western Avenue, Suite 330
Seattle, WA 98121
Telephone: (206) 623-0063

| Q2 2021 | $509,752.37 | $356,826.66 |
| --- | --- | --- |
| Q3 2021 | $502,554.98 | $351,788.49 |

### 3.  Amount of the ERC

19.  For the second, third and fourth quarters of 2020, the credit amount is 50 percent of qualified wages paid and is limited to $10,000 in wages per employee for all quarters pursuant to The Coronavirus Aid, Relief, and Economic Security, Section 2301(b)(1).  For 2021, the credit amount is 70 percent of qualified wages (including allocable qualified health plan expenses) that an eligible employer pays in a calendar quarter and is limited to $10,000 in wages per employee for each quarter (instead of for the year).  IRS Notice 2021-23, 2021-16 IRB 113.

### SOLSTICE

### ORIGINAL FORM 941 TAX RETURNS

20.  A Form 941 payroll tax return was filed by or for Solstice for Q2 2020 on March 8, 2021.  Solstice filed Form 941 payroll tax returns for Q3 2020 on March 14, 2022, for Q4 2020 on September 13, 2021, for Q1 2021 on August 16, 2021, for Q2 2021 on January 17, 2022, and for Q3 2021 on February 7, 2022.  Attached hereto as Exhibits 1, 2, 3, 4, 5, and 6 are true and correct copies of the Internal Revenue Service Account Transcripts for Solstice's Form 941s for Q2 2020, Q3 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021, respectively.

### APPLICATION FOR ERC – FORM 941-X AMENDED TAX RETURNS

21.  Solstice filed Amended Form 941 returns to claim the Employee Retention Tax Credit ("ERC") for Q4 2020 on February 28, 2023 (the amount of the ERC claimed included the ERC amounts for Q2 and Q3 of 2020), for Q1 2021 on February 28, 2023, for Q2 2021 on June

12, 2023, and for Q3 2021 on June 12, 2023. Attached hereto as Exhibits 7, 8, 9, and 10 are true and correct copies of Solstice's Form 941-Xs for Q4 2020, Q1 2021, Q2 2021 and Q3 2021, respectively. The copies of the Form 941-Xs for Q2 2021 and Q3 2021 are unsigned; the original returns were signed.

22. The amounts of Solstice's claimed Employee Retention Tax Credits are $317,920.28 for Q4 2020 (this amount includes ERC claims of $170,549.26 for Q2 of 2020, $66,412.17 for Q3 of 2020, and $80,958.86 for Q4 of 2020), $346,955.18 for Q1 2021, $362,769.35 for Q2 2021, and $345,858.53 for Q3 2021, for a total of $1,373,503.34.

23. On July 16, 2024, the Internal Revenue Service issued a determination denying Solstice's claim for the Employee Retention Credit for the third quarter of 2021. Plaintiff alleges that this determination was in error.

## CAUSE OF ACTION

24. Solstice incorporates paragraphs 1 through 22 as though fully set forth herein.

25. Pursuant to 26 U.S.C. section 7422, a refund suit for the recovery of income taxes can be commenced in District Court after a claim for refund has been filed with the Secretary. Under 26 U.S.C. section 6532, no suit pursuant to 26 U.S.C. section 7422 shall begin prior to the expiration of 6 months from the date of filing the claim for refund nor after the expiration of 2 years from the date the IRS notifies the taxpayer that its claim is disallowed.

26. Solstice has satisfied these elements. Claims for refund were filed on February 28, 2023 for Q4 2020 (the amount of the ERC claimed included the ERC amounts for Q2 and Q3 of 2020), on February 28, 2023 for Q1 2021, on June 12, 2023 for Q2 2021, and on June 12, 2023 for Q3 2021 and more than 6 months have elapsed since filing the claims for refund.

27. Plaintiff is entitled to the ERC credit in the amount of $317,920.28 for Q4 2020 (this amount includes ERC claims of $170,549.26 for Q2 of 2020, $66,412.17 for Q3 of 2020, and $80,958.86 for Q4 of 2020).

28. Solstice is entitled to the ERC credit in the amount of $346,955.18 for Q1 2021.

29. Solstice is entitled to the ERC credit in the amount of $362,769.35 for Q2 2021.

30. Solstice is entitled to the ERC credit in the amount of $345,858.53 for Q3 2021.

31. Solstice is entitled to ERC credits in the total amount of $1,373,503.34.

32. Solstice is also entitled to any interest and penalties which have accrued after the claims for refund were filed to the extent that the interest and penalties would not have been imposed if the ERC credit had been timely approved and processed.

33. Plaintiff has been, and continues to be, damaged by the refusal of the IRS to timely process the Forms 941-X for the taxable periods ending June 30, 2020, September 30, 2020, December 31, 2020, March 31, 2021, June 30, 2021, and September 31, 2021 and to issue the corresponding Employee Retention Credits.

WHEREFORE, Plaintiff prays this Court order the United States to:

(a) Issue a refund in the amount of $170,549.26 for the Employee Retention Credit for the taxable period ended June 30, 2020;

(b) Issue a refund in the amount of $66,412.77 for the Employee Retention Credit for the taxable period ended September 30, 2020;

(c) Issue a refund in the amount of $80,958.86 for the Employee Retention Credit for the taxable period ended December 31, 2020;

(d) Issue a refund in the amount of $346,955.18 for the Employee Retention Credit for the

taxable period ended March 31, 2021;

(e) Issue a refund in the amount of $362,769.35 for the Employee Retention Credit for the taxable period ended June 30, 2021;

(f) Issue a refund in the amount of $345,858.53 for the Employee Retention Credit for the taxable period ended December 31, 2021.

(g) Award Plaintiff damages for any interest, penalties and fees wrongly accruing after the claims for refund were filed to the extent that the interest and penalties would not have been imposed if the ERC credits had been timely approved and processed.

(h) Award Plaintiff reasonable attorney's fees;

(i) Award Plaintiff court costs; and

(j) Award Plaintiff other such relief as is just.

Respectfully submitted on September 23rd, 2024.

By: */s/ Robert V. Boeshaar*
ROBERT V. BOESHAAR #25900
Robert V. Boeshaar, Attorney at Law, LL.M., PLLC
2125 Western Avenue, Suite 330
Seattle, Washington  98121
Tel: (206) 623-0063
Fax: (206) 382-0177
boeshaar@boeshaarlaw.com

*Attorney for Plaintiff*